UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | |
| *v.* | ) | Criminal Case No. 1:16-cr-261-TSE |
| | ) | |
| SREEDHAR POTARAZU, | ) | |
| | ) | |
| *Defendant*. | ) | |

**<u>DEFENDANT SREEDHAR POTARAZU'S SENTENCING MEMORANDUM</u>**

# TABLE OF CONTENTS

I. DR. POTARAZU'S BACKGROUND ........................................................................4

   A.    EARLY YEARS .............................................................................4

   B.    MEDICAL CAREER (1988-2000).........................................................5

   C.    ENTREPRENEUR (1999-2016)............................................................6

   D.    FAMILY .................................................................................10

   E.    PHILANTHROPY ......................................................................11

   F.    SPIRITUAL LIFE ......................................................................12

II.    UNOPPOSED OBJECTION TO SENTENCING GUIDELINES
    CALCULATION.........................................................................12

III.    OBJECTIONS TO SENTENCING GUIDELINES CALCULATION ....................13

   A.    THE GOVERNMENT FAILS TO PROVE LOSS UNDER THE GUIDELINES BEYOND
    $9.59 MILLION .......................................................................14

   B.    THE GOVERNMENT'S CALCULATION IMPROPERLY IGNORES DR. POTARAZU'S
    SUBJECTIVE INTENT .................................................................16

   C.    THE GOVERNMENT'S CALCULATION FAILS TO CREDIT DR. POTARAZU FOR THE
    AMOUNT RECOVERABLE BY THE VICTIMS............................................18

   E.    CALCULATIONS UNDER § 2B1.1 DO NOT PROVIDE A COMMENSURATE SENTENCE
    FOR THE SERIOUSNESS OF THIS TYPE OF OFFENSE ..................................20

IV.    APPLICATION OF THE 18 U.S.C. § 3553 FACTORS COMPEL A VARIANT
    SENTENCE .............................................................................22

   A.    DR. POTARAZU'S  HISTORY AND CHARACTERISTICS SUPPORT A BELOW-
    GUIDELINES SENTENCE ..............................................................23

   B.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE SUPPORT A BELOW-
    GUIDELINES SENTENCE ..............................................................24

   C.    A BELOW GUIDELINES SENTENCE WILL AVOID UNWARRANTED SENTENCING
    DISPARITIES ..........................................................................25

   D.    DR. POTARAZU'S COOPERATION WITH THE GOVERNMENT WARRANTS A
    DOWNWARD DEPARTURE..............................................................26

   E.    A BELOW GUIDELINES SENTENCE WILL STILL AFFORD ADEQUATE DETERRENCE
    AND PROTECT THE PUBLIC ...........................................................27

   F.    AN ALTERNATIVE SENTENCE OF RIGOROUS COMMUNITY SERVICE IS SUFFICIENT,
    BUT NOT GREATER THAN NECESSARY, TO FULFILL THE STATUTORY GOALS ..............28

V.    CONCLUSION .........................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
   552 U.S. 38 (2007)..................................................................................22, 28

*Kimbrough v. United States*,
   552 U.S. 85 (2007)..........................................................................................22

*Rita v. United States*,
   551 U.S. 338 (2007)....................................................................................23, 26

*In re Taneja*,
   No. 08-13293-RGM, 2012 WL 3073175 (Bankr. E.D. Va. July 30, 2012),
   *aff'd*, 743 F.3d 423 (4th Cir. 2014) ................................................................1

*United States v. Baxley*,
   83 F. App'x 561 (4th Cir. 2003) ......................................................................3

*United States v. Biggs*,
   761 F.2d 184 (4th Cir. 1985) ........................................................................15

*United States v. Booker*,
   543 U.S. 220 (2005)........................................................................................22

*United States v. Butler*,
   578 F. App'x 178 (4th Cir. 2014) ..................................................................18

*United States v. Caspersen*,
   No. 1:16-cr-00414 (S.D.N.Y. Nov. 16, 2016) ..............................................17

*United States v. Confredo*,
   528 F.3d 143 (2d Cir. 2008)...........................................................................17

*United States v. Diallo*,
   710 F.3d 147 (3d Cir. 2013)...........................................................................17

*United States v. Doe*,
   398 F.3d 1254 (10th Cir. 2005) .....................................................................26

*United States v. Engleman*,
   916 F.2d 182 (4th Cir. 1990) .........................................................................14

*United States v. Faibish*,
   No. 12-CR-265 ENV, 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015)......................21

*United States v. Fernandez*,
   443 F.3d 19 (2d Cir. 2006)...................................................................26

*United States v. Loayza*,
   107 F.3d 257 (4th Cir. 1997) ............................................................1, 3

*United States v. Mallory*,
   461 Fed.Appx. 352 (4th Cir. 2012)......................................................18

*United States v. Manatau*,
   647 F.3d 1048 (10th Cir. 2011) ...............................................16, 17, 18

*United States v. Marvin*,
   28 F.3d 663 (7th Cir. 1994) .................................................................18

*United States v. Miller*,
   316 F.3d 495 (4th Cir. 2003) ...............................................................16

*United States v. Ovid*,
   slip op., 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010)............................20

*United States v. Pierce*,
   409 F.3d 228 (4th Cir. 2005) ...............................................................14

*United States v. Sanders*,
   343 F.3d 511 (5th Cir. 2003) ...............................................................17

*United States v. Wills*,
   476 F.3d 103 (2d Cir. 2007)..................................................................25

**Statutes**

18 U.S.C. § 2314........................................................................................3, 15

18 U.S.C. § 3553(a) ................................................................................ *passim*

26 U.S.C. § 7202............................................................................................3

Federal Insurance Contributions Act (FICA) .............................................17

**Other Authorities**

A Report on Behalf of the American Bar Association Criminal Justice Section
   Task Force on the Reform of Federal Sentencing for Economic Crimes,
   November 10, 2014................................................................................20, 21

Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal
   Sentencing for Economic Offenses*, Criminal Justice ..............................20

Black's Law Dictionary (7th Ed. 1999) ........................................................................1

DOJ Press Release, *Former Finance Executive Andrew Caspersen Sentenced To Four Years In Prison For Defrauding Investors Of Over $38 Million And Misappropriating Over $8 Million From His Former Employer*, November 4, 2016 ...........................................................................................................................25

Enziime: Think Faster, http://www.enziime.com ......................................................10

Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,* Prison Journal ...............................................................................27

Laura Lorenzetti, *Here's How IBM Watson Health is Transforming the Health Care Industry*, Fortune, Apr. 5, 2016 ................................................................................6

Michael Tonry, *Purposes and Functions of Sentencing,* CRIME & JUSTICE .................................27

Neil Patel, *90% of Startups Fail: Here's What You Need to Know About the Other 10%*, Forbes, Jan. 14, 2015 ......................................................................................1

Tax Rates as a Percent of Taxable Earnings Table, https://www.ssa.gov/oact/progdata/taxRates.html ...................................................17

United States Sentencing Commission Guidelines Manual 2016 ......................................... *passim*

United States Sentencing Commission Amendments to the Sentencing Guidelines, April 30, 2015 ............................................................................................................15

Yona Health Systems, http://www.yonahealth.com ...................................................10

Dr. Sreedhar Potarazu did not create and is not charged with creating a Ponzi scheme.[1]  His company, VitalSpring Technologies, Inc. ("VitalSpring" or "the company"), is a legitimate enterprise that developed intellectual property with real and significant value.  VitalSpring is a software company that helped large businesses and  healthcare and insurance providers better understand and leverage "big data" to help them become more sophisticated and efficient purchasers of health insurance for their employees.[2]  VitalSpring had numerous customers (Kodak, Amtrak, Microsoft, Sara Lee – to name a few); established partnerships with prominent players in the technology industry such as SAP; and employed computer and software engineers, accountants, business development specialists and sales staff, human resource specialists, and healthcare data experts.  VitalSpring also had over 150 investors – men and women who invested, and risked, approximately $60 million into this small start-up business that was at the forefront of the healthcare data industry.[3]  VitalSpring generated real revenues and provided real value to its employees and customers.

To be sure, like 90 percent of other Internet start-up companies this legitimate venture failed to meet its ambitious revenue targets.[4]  There came a point when Dr. Potarazu was faced

---

[1] A "Ponzi" scheme is a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments. Money from the new investors is used directly to repay or pay interest to old investors, usually *without any operation of revenue-producing activity* other than the continual raising of new funds."  BLACK'S LAW DICTIONARY (7th ed. 1999) at 1180 (emphasis added).  *See also United States v. Loayza*, 107 F.3d 257, 259 (4th Cir. 1997); *In re Taneja*, No. 08-13293-RGM, 2012 WL 3073175, at *1 (Bankr. E.D. Va. July 30, 2012), *aff'd*, 743 F.3d 423 (4th Cir. 2014).  The government's trial counsel has conceded that they do not view the criminal conduct in this case as a Ponzi scheme.
[2] VitalSpring was later re-incorporated into Enziime, LLC.  As of November 29, 2016, it operates as Yona Healthcare Systems LLC ("Yona").
[3] VitalSpring's Investor Letter notified the investors that "the acquisition of the Series B Convertible Preferred Stock is a speculative investment involving a high degree of risk and that there is no guarantee that the Investor will realize any gain from an investment in them. The Investor further understands that the Investor could lose the entire amount of the Investor's investment."  Exhibit 8.
[4] *See* Neil Patel, *90% of Startups Fail: Here's What You Need to Know About the Other 10%*, Forbes, Jan. 14, 2015, https://www.forbes.com/sites/neilpatel/2015/01/16/90-of-startups-will-fail-heres-what-you-need-to-know-about-the-10/#5b486ce36679.

with a fateful decision.  Dr. Potarazu could have come clean with his investors – many of whom were friends, family, and members of the tight-knit Indian-American community in which his family were prominent members – and told them that the company was bankrupt, and that much of their equity was lost.  Unfortunately, Dr. Potarazu obfuscated the financial records with the hope of buying himself the extra time necessary to a land an additional contract and grow the company's revenues.  As Dr. Potarazu now sees clearly, there was only one choice that was consistent with good sense and the law.  Dr. Potarazu made the wrong choice – a spectacularly wrong choice.  And, of course, having once made that wrong choice, it became increasingly difficult to go back and make the right one.  The company never reached profitability and to have come clean at that point would have meant not only bankruptcy, but an admission of fraud.  Caught in a trap of his own making, Dr. Potarazu continued to operate the company, and continued to deceive his investors, as the company slipped further and further into the red.

Importantly, throughout this time, Dr. Potarazu never gave up on his dream to grow VitalSpring's revenues.  He drove himself relentlessly to make the business a success, and as late as 2016 continued to land customers including Fortune 500 companies like Novartis.  As reflected in the government's own accounting, the amount of money Dr. Potarazu personally realized from operating the company was dwarfed by the money legitimately expended on company payroll and payments to creditors for legitimate expenses of the company.  However, the company's losses continued to mount, and Dr. Potarazu found himself doing increasingly desperate, and illegal, things to keep the company afloat.  As the accounting records reveal, his motivation for these criminal acts was not self-enrichment, but rather the hope of one day managing a successful company and the fear of humiliation on the inevitable day of reckoning when his fraud was exposed.

Since the day of his arrest, Dr. Potarazu has accepted full responsibility for his criminal actions.  At the earliest possible opportunity, he accepted the government's pre-indictment plea offer and pled guilty to inducing interstate travel to commit fraud in violation of 18 U.S.C. § 2314 and willfully failing to account for and pay taxes in violation of 26 U.S.C. § 7202.  He met with government investigators on two occasions, answering questions about his own wrongdoing and providing substantial assistance to the government in the investigation and prosecution of two individuals.

Dr. Potarazu takes full responsibility for his crimes.  A just sentence requires that the Court understand that the fraud perpetrated in this case was a response – albeit one lacking in all good judgment – to the pressures of a crumbling company rather than the manifestation of an intention simply to enrich himself.  Sreedhar Potarazu is a business man who failed and made terrible decisions to mask that failure.

The government now comes to the Court and asks it to find that every dollar invested in VitalSpring over the past nine years be treated as an intended loss for sentencing purposes.  While that loss calculation method may be appropriate for a Ponzi scheme, it is inappropriate to use it in this case and will result in an unjust sentence.  *Compare United States v. Loayza*, 107 F.3d 257, 266 (4th Cir. 1997) (in a Ponzi scheme case the court declined "to follow the approach of 'net loss' and [held] defendants responsible for the value of all property taken, even though all or a part is returned. Where the 'intended loss' is greater than the 'actual loss,' the intended loss should be used") *with United States v. Baxley*, 83 F. App'x 561, 562–63 (4th Cir. 2003) (upholding, in a case involving fraud other than a Ponzi scheme, the district court's finding that "the legal theory is correct for the intended loss to be calculated but I find that over-states [sic] the seriousness of the offense…").  The government's position is inconsistent with the case law, ignores both the

legitimacy of the operations by and the present value of the company, and establishes a potential sentence that is well beyond what is necessary to provide a just punishment and deter future criminal conduct.

With that background and in light of the factors enumerated in 18 U.S.C. § 3553(a), we respectfully request that the Court consider a sentence far below the advisory guideline range for the reasons set forth below.  Based upon a detailed examination of Dr. Potarazu's character and background, the circumstances of the offenses, his lack of any prior criminal history, his extensive and voluntary cooperation, and the substantial assistance he has provided to the government, the applicable guideline range is far greater than necessary to satisfy any purpose of sentencing.

## I. DR. POTARAZU'S BACKGROUND

### A.    EARLY YEARS

Sreedhar Venkatanga Potarazu was born on May 9, 1965 in Washington DC. His parents Krishna Rao and Rukmini were immigrants to the United States. Krishna Rao and Rukmini raised their two sons in Maryland for most of their years in a devout Hindu home.  His father came to the United States in 1954 as a student at the age of 24 to study meteorology at the University of Florida in Tallahassee. Dr. Krishna Rao subsequently went to NYU to obtain a PhD in physics.  He served the government as one of the highest-ranking Indians to date as a part of the Senior Executive Service at the National Weather Service under the Department of Commerce.  Rukmini, Sreedhar's mother, while a housewife, became a force in the burgeoning Indian-American community -- welcoming newcomers and assisting with their assimilation into American society, while preserving and honoring their Indian heritage.  The Potarazus were one of ten families who founded the largest Hindu Temple in the United States, which is currently located in Lanham, Maryland.

Sreedhar was a gifted student from a very young age.  Although Dr. Krishna Rao's work took the family to Switzerland for a number of years, Sreedhar spent most of his childhood education in the Maryland public school system, ultimately graduating from Potomac High School at the age of 15 and entered George Washington University.  Continuing to excel at his studies and motivated by a drive to succeed (and quickly) that would color the trajectory of his professional career, Sreedhar left GW to complete a two-year, accelerated medical program in Manipal, India.  Upon his return, after a series of arduous exams, he was accepted and enrolled as a second-year medical student at GW.  He impressed his professors and peers alike with his intellect and ambition.  In 1988, at the age of 23, Sreedhar graduated from medical school with distinction.

### B.       MEDICAL CAREER (1988-2000)

During his medical residency at GW in general surgery Dr. Potarazu developed an interest in ophthalmology.  He completed the highly competitive ophthalmology residency at GW in 1993.  His training lead to a specialization in glaucoma and optic-nerve pathology.  He was admitted to two fellowships at the prestigious Bascom Palmer Eye Institute in Miami, FL.  While there he conducted innovative research in the use of calcium channel blockers as a means of providing protection for the optic nerve when it incurred a stroke.  The papers he published on this research are still quoted today on the role of neuro- protection and treating optic nerve disease.  Ultimately he was asked to join the faculty at Bascom Palmer.

In 1995, Dr. Potarazu moved his family to Washington, D.C. and joined Northern Virginia Ophthalmology Associates as a specialist in glaucoma and neuro-ophthalmology.  He also joined the faculty of the prestigious Wilmer Eye Institute at Johns Hopkins University.  He developed an expertise in caring for individuals with complicated glaucoma and other disorders of the optic nerve related to the neurologic system. In particular, he became an expert in caring for babies born

with glaucoma on whom he had operated to prevent blindness and protect their vision. Additionally, he volunteered his time at two hospitals in India. He performed surgeries at no cost and consulted with patients in need of glaucoma care.

While on the Johns Hopkins faculty, Dr. Potarazu was admitted to the MBA program where he studied part-time over three years to obtain his degree.  His MBA thesis focused on how technology might be used in improving the cost and quality of healthcare. Although Dr. Potarazu never intended to leave the practice of medicine, he, with the encouragement of his professors at Johns Hopkins, pursued his theoretical business model in the real world.  In 1999, he did so and the company that would become VitalSpring Technologies was born.

## C.    ENTREPRENEUR (1999-2016)

In August 1999, Dr. Potarazu started Medical Internet Solutions with the broad vision of providing greater transparency to employers, insurance companies, and consumers about the cost and quality of healthcare. The aim was to build proprietary software capable of aggregating data from disparate sources such as claims, medical records, and payroll data.  Analytics of the combined data would then be tailored for a specific customer to improve the cost of insurance benefits, prescription drug plans, doctors networks, and consumer health programs.  At the onset of the market boom, interest was high in exactly this type of internet company.[5]  When the company received an investment from Microstrategy, then a rising star on the stock market, it prompted other investors to join.  However, when Microstrategy's own stock fell in March of 2000 because of erroneous financial statements, Medical Internet Solutions also suffered.  It was the

---

[5] Medical Internet Solutions was well ahead of its time; by way of comparison, IBM Watson Health only started handling these types of data sets in 2014.  *See* Laura Lorenzetti, *Here's How IBM Watson Health is Transforming the Health Care Industry*, Fortune, Apr. 5, 2016, http://fortune.com/ibm-watson-health-business-strategy/.

first sign that Dr. Potarazu's business would not withstand the sharp, extraneous shifts in the data technology marketplace.

Dr. Potarazu continued to work to develop his business model, clarifying the company's purpose in aiding employers in achieving greater efficiency in the healthcare marketplace through data analytics. The model showed promise and, in 2001, AOL agreed to be a beta customer to help the company deliver its first finalized product. This partnership illustrated the great potential of Dr. Potarazu's idea but also the challenges associated with transforming his vision into a viable operation. For nearly four years, VitalSpring operated without revenue or paying customers, in order to gain access to the volume of data necessary to build out a working product.

By 2003, the company had a new name – VitalSpring Technologies – and its first paying customer, McDonald's. Over the years, VitalSpring helped McDonald's better manage its supply chain of healthcare insurance vendors and identify opportunities to reduce its costs of employee healthcare benefits. *See* Declaration of Robert B. Wittcoff, hereto attached as Exhibit 1. From the period of 2004 to 2006, the company added more employers to their client roster, including Raytheon, Amtrak, Transamerica, Sara Lee, Hanes, and Google among others.

It is a cliché these days to point out that Internet startups in the decade from 2000 to 2009 were spectacularly risky investments. However, to this point, VitalSpring had a track record that surpassed the vast majority of its peers. In less than a decade it had gone from a mere concept to a working company, employing several software engineers, and dozens of employees overall. *See* Declaration of Brian Reece, hereto attached as Exhibit 2. It had revenues in excess of $3 million in 2007 and continuing revenue streams from over 20 companies, including such Fortune 500 stalwarts as Pactiv, Discovery, BMW, Microsoft, and Google. *See, e.g.* Declaration of Michael Aldrich, hereto attached as Exhibit 3; Declaration of Anthony Amato, hereto attached as Exhibit

4.  In 2007, the company formed a relationship with SAP with the hopes of expanding its reach in the market without having to invest in a large sales force. The company invested significant dollars and man power in the difficult and ambitious undertaking of building out the technology to support the SAP relationship. Within a few months of launching the relationship, SAP shelved the request for the technology VitalSpring had invested heavily in developing.  Moreover, SAP hired away many of the company's sales team. This understandably took another significant toll on the company.

In 2008, VitalSpring attempted to merge with Revolution Health in order to establish some sort of foothold in the industry and dig out of the red.  The deal would have salvaged the value of what VitalSpring had built.  Unfortunately, the merger was unsuccessful due to Revolution's own financial crisis.  In addition, the 2008 financial crash plus the seismic shifts in the healthcare space generally due to the passing of the Affordable Care Act pushed VitalSpring in a further downward spiral.  Specifically, VitalSpring lost key clients due to the changes in healthcare brought about by the ACA; essentially, VitalSpring needed to reinvent its entire business model or shut down.  Dr. Potarazu has since acknowledged in retrospect that at this point in time he should have shuttered the business and admitted defeat.

Instead, he doubled down on his endeavor to find a sale or other infusion of capital that would preserve the investments of the many non-institutional shareholders and maintain the livelihood of the engineers, analysts, and others working so hard to bring the idea to fruition.  Dr. Potarazu, the former child prodigy, simply could not conceive of a reality wherein he failed to create a solution to his business problems.  He truly believed that if he could buy himself more time, even by unethical and criminal means, then he could eventually do right by his shareholders in the end.

8

Although it struggled to find a buyer or other strategic partner that could solve its cash flow problems, VitalSpring continued to impress commercial clients with its technological offerings. VitalSpring's collaborations with SAP and later Oracle confirmed the strength and value of its technology within the industry. From 2010 to 2013, VitalSpring signed lucrative contracts with the following marquis clients: CACI, Discovery Corp., Hanes, Henry Ford Health System, Jack in the Box, Exel, and Cargill.

In 2013, the company took on new projects to assist insurance companies with the management of their data. For example, it was able to help United Healthcare better manage its data management. Nevertheless, the expenditures of the business far outweighed the revenue generated by these customers. VitalSpring, hemorrhaging cash and beaten down by the bursting of the Internet bubble and a drastically different healthcare landscape, failed to find a corporate suitor in this environment, despite Dr. Potarazu's efforts. Not surprisingly, shareholder discontent at the lack tangible returns and Dr. Potarazu's failure to provide substantive updates reached a fever pitch by 2014. On October 27, 2014, a shareholder filed a derivative lawsuit in Delaware against VitalSpring and Dr. Potarazu. In the face of the lawsuit and aggressive, vocal pushback from other investors, Dr. Potarazu panicked. His conduct to outrun his creditors, including the Internal Revenue Service, became more brazen and risky.

Dr. Potarazu's mounting financial and corporate governance problems did not materially interfere with the operations of the business itself.[6] Toward the end of 2014, the company engaged in discussions with WebMD to assist in its data management. As a result of the WebMD partnership, by 2016, VitalSpring began to see revenues from customer contracts including: McKinsey, Better Outcomes, and Decision Resources. Also in early 2016, the company engaged

---

[6] In early 2015, VitalSpring re-incorporated as Enziime, LLC and operated under that name until November 2016.

in contract discussions with Change Healthcare (CHC) for VitalSpring to act as a re-seller of CHC's claims database. The company was finally able to leverage the capabilities built over 15 years and use healthcare data in a more efficient way.

When Dr. Potarazu was arrested in October of 2016, VitalSpring faced shuttering its operations and declaring bankruptcy. Instead, on November 29, 2016 an outside investor, Yona Health Systems, LLC ("YHS"), saw value in the company and purchased assets from VitalSpring, including "[a]ll customer relationships including service contracts . . . [a]ll licenses to transfer data . . . [a]ll computer and hardware . . . all software and all company knowledge for processes, procedures, documentation, credentials and instructions for all company owned and/or company developed business products, software applications, and business data processing . . . [a]ll custom software codes developed by [VitalSpring] . . . [and] [a]ll accounts receivables for services provided by [VitalSpring]." *See* Asset Purchase Agreement, hereto attached as Exhibit 5. Yona is a fully functioning business operation, servicing the customer contracts VitalSpring performed until October 2016. *Compare* Yona Health Systems, http://www.yonahealth.com/ (last visited Mar. 24, 2017) *with* Enziime: Think Faster, http://www.enziime.com (last visited Mar. 24, 2017).

### D.   FAMILY

Sreedhar hails from a family that has been deeply rooted in Indian culture and tradition. His mother and father worked hard to ensure that their children were raised in an environment where they were able to balance their dual identities as American and Indian. They grew up in the middle-class neighborhood of Temple Hills, Maryland. The family also made frequent trips to India to visit relatives and friends.

In early 1988, while on a medical school rotation during his final year in India, he met Jyotsna, his future wife. She grew up in Mumbai on the campus of the Indian Institute of

Technology where her father was a professor for over 30 years. Jyotsna's upbringing was consistent with Sreedhar's, deeply rooted in faith, culture and community.  Leaving India for the first time, Jyotsna came to the United States with Sreedhar in 1989.  She received her Masters degree from GW in computer science and has worked as a software engineer ever since.

In 1993, the Potarazus were blessed with their first child Deepika.  Four years later, in 1997, another beloved daughter Savita was born.  Both of the girls went on to achieve significant academic success. Deepika graduated from Duke University and is currently studying medicine at GW medical school. Savita is in the seven year medicine program also at GW. Both girls continue to be actively involved in their cultural pursuits in addition to their rigorous academic schedules. From a young age, Dr. Potarazu and his wife established an environment heavily focused on Indian classical dance and music for their two daughters. For several years, the girls learned classical Indian dance every day at home from instructors who would visit from India. After several years, both Deepika and Savita achieved a proficiency in Kuchipudi style of Indian classical dance that was unparalleled amongst their peers. Both girls would perform and train in India during the summers for many years.

### E.    PHILANTHROPY

Beginning in 1998, Sreedhar and his wife were actively involved in supporting artistic endeavors to promote the preservation of Indian culture and fine arts both in India and the United States. He and his wife were instrumental in supporting leading artists and their endeavors from the late 1990s.  In fact, Jyotsna started her own nonprofit entitled Sivam to help promote education and preservation of the arts.  The Potarazu family has for years hosted many of these artists in their own home and provided medical care and financial assistance to many artists at a time when they were in desperate need.  They covered the medical expenses for their ailing dance teacher.  Most

recently, during the severe floods in Chennai in December 2015, the Potarazu family supported many artists who lost their homes and their instruments and replaced sewing machines for tailors of dance costumes.

In May 1997, Sreedhar co-founded a foundation providing scholarships for Indian American students with academic talent. Dr. Potarazu recognized that the Indian community in the United States lacked an organization focused on students with financial need.  Moreover, there is strong pressure to study engineering and/or medicine within the community with little encouragement to pursue liberal arts education.  Upakar, the Indian American Scholarship Foundation has now provided over $500,000 in scholarships to over 165 students from 28 states across the United States.

### F.  SPIRITUAL LIFE

The core of Dr. Potarazu's way of life has been centered around spirituality. Since his teenage years, he has been attracted to Vedanta, a Hindu philosophy based on the doctrine of the Upanishads.  He continues his study of the Bhagavad Gita to this day. His daily routine is deeply rooted in prayer and meditation.

Both Dr. Potarazu and his wife have been deeply involved in the activities of their Temple as well as the Chinmaya Mission for decades. They continue to support these organizations to the best of their abilities and much of their limited free time is focused on religious activities.

### ARGUMENT

### II.  UNOPPOSED OBJECTION TO SENTENCING GUIDELINES CALCULATION

Dr. Potarazu and the government jointly object to the offense level calculation under the guidelines because the Presentence Report (PSR) calculation does not reflect the agreement between Dr. Potarazu and the government that his offense level shall not be higher than a level 31,

yielding a maximum guidelines sentence of 108 to 135 months, and it is inconsistent with the evidence.[7]

Despite an agreement between the parties, the Probation Officer inappropriately included a two level upward adjustment for obstruction of justice to Dr. Potarazu's offense level.  The government and Dr. Potarazu request that this adjustment be rejected by the Court.   First, Dr. Potarazu has cooperated fully with the United States since his arrest in October 2016.  Moreover, the facts cited by the probation officer in support of the adjustment – which were known by the government at the time of plea hearing – were part of Dr. Potarazu's efforts at disguising his fraudulent acts and not obstructive conduct as defined in the sentencing guidelines.  PSR at ¶¶ 97-100.  This is why the government agreed not to include the adjustment in its calculations and plea agreement.  Also, the Probation Officer recognized Dr. Potarazu's outstanding level of cooperation and noted that there is no evidence of any obstructive conduct since his arrest.  *Id.* at ¶ 102.  Finally, the parties recognize that the agreement between the United States and the Dr. Potarazu is just that – and that the Court has the authority to include adjustments on its own.  However, we believe that, particularly in these circumstances, where the government is in the best position to evaluate whether its investigation was, in fact, obstructed by the defendant's actions, the Court should honor the agreement of the parties, which necessarily incorporates the government's determination that the obstruction enhancement does not apply.  *See* PSR Addendum at 42.

## III.   OBJECTIONS TO SENTENCING GUIDELINES CALCULATION

The PSR imposes a 22 level upward adjustment to the base offense level under Guideline §2B1.1(b)(1)(L) and finds that the "[t]he defendant is being held accountable for a loss of

---

[7] In the plea agreement, the government and defendant agreed that there should be no additional sentencing enhancements other than those included.  Dkt. 39 – Plea Agreement at ¶5.  Thus, the agreed maximum offense level is 31.

$49,511,169." *Id.* at ¶ 105. According to the plea agreement, Dr. Potarazu and the government have not agreed to a loss amount. Dr. Potarazu argues that an increase of 20 levels under Guideline §2B1.1(b)(l)(K) is appropriate because the loss exceeded $9.5 million, but was less than $25 million.

The government seeks to hold Dr. Potarazu accountable for a total loss of $57,202,240.22, which includes $49,511,169 in losses relating to Count I. In order to sustain the proposed $50 million loss, the government must prove by a preponderance of the evidence that (1) every dollar invested in the company after January 1, 2008, is an intended loss caused by Dr. Potarazu's fraud; (2) at the time of Dr. Potarazu's sentencing, the company has zero value; and (3) every investor in the company, after January 1, 2008, was a victim of Dr. Potarazu's fraud. The government has failed to meet its burden. Dr. Potarazu should not be held accountable for the government's inaccurate total based on flawed calculation and unfounded assertions.

### A.    The Government Fails to Prove Loss under the Guidelines Beyond $9.59 Million

Loss amount in a fraud case must be proved by the government by a preponderance of the evidence. *United States v. Pierce*, 409 F.3d 228, 234 (4th Cir. 2005); *United States v. Engleman*, 916 F.2d 182, 184 (4th Cir. 1990). In order to attribute an actual loss amount of $49,511,169 in total losses for 2008 through 2016, the government presupposes that every individual who invested in the company was induced to do so but for Dr. Potarazu's fraud. This is simply not the case and the government, which bears the burden of proof on this issue, has adduced no evidence to establish this necessary causation. A proper loss calculation includes only losses by actual victims of the offense.[8] An 18 U.S.C. § 2314 offense requires two elements: (1) that defendant devised a scheme

---

[8] "Victim" means any person who sustained any part of the actual loss determined under subsection (b)(1) of the guidelines. Guideline §2B1.1, Comment n.1.

intending to defraud a victim of money or property of a minimum value of $5,000 and (2) that as a result of this scheme, a victim was induced to travel in interstate commerce. *United States v. Biggs*, 761 F.2d 184, 187 (4th Cir. 1985). If an investor had knowledge of the true financial state of the company, despite Dr. Potarazu's misrepresentations, and still invested money, *then he could not have been induced to travel across state lines by Dr. Potarazu's fraud.* The evidence in this case illustrates that certain VitalSpring investors knew about the true financials of the company to be properly considered victims now for purposes of loss amount under the guidelines. *See, e.g.*, Jan. 29, 2015 Email, hereto attached as Exhibit 6.

As it fails to address causation, the government's calculation must be based on the concept of intended loss. In order to attribute an intended loss amount of $49,511,169, the government must prove that Dr. Potarazu purposefully sought to cause that level of harm. [9] *See* United States Sentencing Commission Amendments to the Sentencing Guidelines at 24 (April 30, 2015), available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf (confirming a subjective inquiry requirement in Application Note 3(A)(ii) and stating "[t]he amendment reflects the Commission's continued belief that intended loss is an important factor in economic crime offenses, but also recognizes that sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability"). The record is void of any such evidence. Here, it is uncontested that a significant portion of the $60 million of investments in VitalSpring was used to advance the interests of the company and shareholders. For instance, the evidence shows that VitalSpring paid over $50 million for legitimate employee salaries for the

---

[9] Dr. Potarazu concedes that the loss amount attributable to Count II totals $7,691,071.22.

years 2007 to 2016.[10]  The government also acknowledges that Dr. Potarazu used only $1.9 million

for personal expenses from 2010 to 2016.  *Id.* at ¶¶ 49-50.[11]  Dr. Potarazu clearly made mistakes

as a business leader and understands he will be punished for his criminal acts.  But we believe the

proper calculation of loss in this case under the guidelines, for purposes of sentencing, must take

into account his significantly less culpable state of mind.

### B.      The Government's Calculation Improperly Ignores Dr. Potarazu's Subjective Intent

The government's calculation of loss includes every dollar invested in VitalSpring since

January 1, 2008.  We believe this is wrong.  The government has marked this total amount as the

"pecuniary harm that the defendant *purposely* sought to inflict," despite the fact that nearly all of

the funds were used for legitimate business expenses (including salaries, equipment, leases, etc.).

Guideline §2B1.1(b)(1), Comment n.3(A)(ii).  *But see, e.g.*, *United States v. Miller*, 316 F.3d 495,

502 (4th Cir. 2003) ("Guidelines permit courts to use intended loss in calculating a defendant's

sentence, even if this exceeds the amount of loss actually possible, or likely to occur, as a result of

the defendant's conduct").

Guideline §2B1.1(b)(1)'s definition of "intended loss" requires an inquiry into the subject's

intent.[12]  The Commission officially endorsed the Tenth Circuit's holding in *United States v.*

*Manatau*, 647 F.3d 1048 (10th Cir. 2011) for this standard and it is instructive here.  "[T]he district

court should examine what losses [the defendant] intended. Of course, in answering this question

---

[10] The government and defendant have agreed that VitalSpring failed to pay approximately $7.7 million in FICA taxes on employee salaries of approximately $50 million for 2007 to 2016.

[11] Dr. Potarazu donated approximately $330,000.00 to Democratic National Committee during the relevant time period.  He has requested, through counsel, that those funds be returned to be used to repay investors.  *See* Letter to Henry Munoz, hereto attached as Exhibit 9.

[12] The guidelines also provide that the sentencing judge need only make a reasonable estimate of the loss, based on available information and considering a number of factors including the scope and duration of the offense. Guideline §2B1.1, comment 3(C)(vi).  In making the loss calculation, a court may also make the final choice among competing methods of calculating loss.  *Id.*  The circumstances of the particular offense in this case require a different method of calculation, so as to avoid an unjust result in sentencing.

the court is free, as we have explained, to make reasonable inferences about the defendant's mental state from the available facts." *Id.* at 1056. *See also United States v. Diallo,* 710 F.3d 147, 151 (3d Cir. 2013) ("To make this determination, we look to the defendant's subjective expectation, not to the risk of loss to which he may have exposed his victims."), *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) (remanding for consideration of whether defendant had "proven a subjective intent to cause a loss of less than the aggregate amount" of fraudulent loans); *United States v. Sanders*, 343 F.3d 511, 527 (5th Cir. 2003) ("our case law requires the government prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level").

Dr. Potarazu did not create a Ponzi scheme; that is to say, he did not purposefully take others' money without an underlying revenue-producing operation.[13]  In fact, using a $7.7 million figure (*i.e.* the loss amount agreed to by the parties for Count II) as the amount owed in FICA taxes on employee salaries, VitalSpring had personnel costs of over $50 million from 2007 to 2016.[14] Employee salaries is just one of many permissible and legitimate expenses for which Dr. Potarazu used investor money as the company continued to struggle to increase revenue.

To hold Dr. Potarazu now responsible for $50 million in losses simply ignores the millions of dollars legitimately spent from 2008 to 2016 operating the business of VitalSpring.  Even the government acknowledges that he intended to run a business by citing to employee payroll and vendor payments in characterizing VitalSpring as a "failed company."  Dkt. 45 – Gov.'s Opp. at 3.  Loss amount in a fraud case must be proved by the government by a preponderance of the

---

[13] The PSR recognizes that if the business is "legitimate" then the loss amount should be reduced by "funds [used] to pay business expenses."  PSR Addendum at 45.
[14] The Federal Insurance Contributions Act (FICA) requires a 15.3% withholding of various taxes by a company on employee salaries.  *See* Tax Rates as a Percent of Taxable Earnings Table, https://www.ssa.gov/oact/progdata/taxRates.html (last visited Mar. 24, 2017).

evidence.   The Court should not follow the government's decision to merely "tote up" the investments without looking behind the balance sheet to Dr. Potarazu's motivations and actions. *Manatau*,  647 F.3d at 1049.  In a case where the defendant committed investor fraud related to an otherwise legitimate business, the proper calculation of loss amount is the total amount paid by the victims, minus the cost of legitimate work performed.  *See United States v. Butler*, 578 F. App'x 178, 182 (4th Cir. 2014) (upholding loss calculation that deducted the value of "the work performed by the third party subcontractors [that] unquestionably provided legitimate value to [the victim]" when the third parties worked without any knowledge of or involvement in Defendant's scheme); *see also United States v. Marvin*, 28 F.3d 663, 665 (7th Cir. 1994) ("we distinguished between the true con artist, who has no intention of performing the undertaking he has promised, from the less harmful con artist who initially lies to get a contract, but fully intends to perform the underlying services promised.").  Here, that amount is the tax loss plus $1.9 million of investor funds.

### C.    The Government's Calculation Fails to Credit Dr. Potarazu for the Amount Recoverable by the Victims

Under guideline § 2B1.1 Comment 3(A) a defendant is entitled to a reduction of the loss amount by the actual amount recovered by the victims at the time of sentencing.  *See United States v. Mallory*, 461 Fed.Appx. 352, 361 (4th Cir. 2012).[15]   Here, the government contends that VitalSpring has zero or next-to-zero value as a business entity and thus the shareholder victims can recover nothing.  A share in VitalSpring, so the government argues, is worth zero because VitalSpring's debts outweigh its assets and revenues.  This position ignores the crucial fact that VitalSpring's assets have since been transferred to a new business entity Yona Healthcare Systems

---

[15] The government has acknowledged that this is the correct standard to apply for loss amount in this case.  Dkt. 45 at 2 ("The defendant can only receive a credit against the losses he caused the shareholders if their Yona stock has a current value").

LLC which is currently performing VitalSpring's former customer contracts.[16]  As a part of this transfer, VitalSpring shareholders now hold a 25 percent interest in the value of Yona.

The government's position on the valuation of VitalSpring or Yona is based on its assessment of VitalSpring's assets and liabilities and the fact that Yona's stock is not publicly traded.  Both of these are improper and erroneous methods of determining a company's fair market value.  The government states that "VitalSpring is valueless because it has massive liabilities to the Internal Revenue Service ("IRS"), its employees, and its vendors, and 2) VitalSpring's shareholders have received nothing from the investments Potarazu fraudulently solicited."  Dkt. 45 – Gov.'s Opp. at 3.  Almost every start-up company, particularly in the technology field, goes through a phase in its development in which its balance sheet valuation is negative.  Accurate valuation of Internet companies is rarely performed by the methodology employed by the government.  Instead, as the defendant will demonstrate through expert testimony, Internet start-ups are routinely and appropriately valued by reference to the value of the assets, both tangible and intangible, that  a company owns, and by reference to the company's future expected revenue stream.  *See* Affidavit of Neil Beaton, hereto attached as Exhibit 7.  In this case, VitalSpring possesses assets that the government did not value independently, but instead relied on off-hand comments made by John Bond, VitalSpring's recently retained corporate counsel. Mr. Bond is not, and does not claim to be, an expert in valuing IT businesses and did not perform a valuation for VitalSpring or Yona.

Establishing loss amount in this case by a preponderance of the evidence requires a valuation of the shares held by VitalSpring shareholder victims by an industry-standard, generally-accepted method.  To date, the government has made no effort to evaluate properly the credit to

---

[16] Yona assumed contracts for the services developed by Dr. Potarazu for following customers: Excel, Transamerica, Real Appeal, BCBSA7, Optum, Norvartis, Better Outcomes, Decision Resources, McKinsey, and MedicxMedia.

which Dr. Potarazu is entitled in this case.  A just calculation of loss must include a consideration

of the fact that the true value of VitalSpring is the value at the time it was transferred to Yona.

### E. Calculations under § 2B1.1 do not provide a commensurate sentence for the seriousness of this type of offense

The fraud guidelines have been criticized for years for being too driven by loss amounts

that may be a poor measure of culpability or difficult to calculate, and for calling for unreasonably

high sentences. "While the fraud guideline focuses primarily on aggregate monetary loss and

victimization, it fails to measure a host of other factors that may be important, and may be a basis

for mitigating punishment, in a particular case." Allan Ellis, John R. Steer, Mark Allenbaugh, *At

a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011); *see

also United States v. Ovid*, slip op., 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud

guideline, despite its excessive complexity, still does not account for many of the myriad factors

that are properly considered in fashioning just sentences, and indeed no workable guideline could

ever do so.").  As a result of the operation of the guidelines here, Dr. Potarazu, a first-time, non-

violent offender who has pled guilty pre-indictment, faces a range virtually equivalent to those of

serious violent offenders.  *See* Guideline § 2A1.3 (offense level of 29 for voluntary manslaughter);

Guideline § 2A2.1 (offense level of 33 for assault with intent to murder); Guideline § 2A3.1

(offense level of 30 for criminal sexual abuse); Guideline § 2A4.1 (offense level of 32 for

kidnapping or abduction); Guideline § 2A6.2 (offense level of 18 for domestic violence).

In response to this widespread criticism, the Criminal Justice Section of the American Bar

Association created a Task Force on the Reform of Federal Sentencing for Economic Crimes.  In

November 2014, the Task Force released a final draft proposed rewrite of the § 2B1.1 chart that

goes beyond a simple calculation based only on loss amount. *See A Report on Behalf of the

American Bar Association Criminal Justice Section Task Force on the Reform of Federal*

*Sentencing for Economic Crimes*, (Nov. 10, 2014), available at http:// www.americanbar.org/content/dam/aba/uncategorized/criminal_justice/ economic_ crimes.authcheckdam.pdf. The report proposed a base offense level between six and eight which would be altered by three specific offense characteristics: loss, culpability, and victim impact. *Id.* Notably, a "defendant seeking an assessment of 'low' or 'lowest' culpability bears the burden of proof to establish this, while the government bears the burden to prove either 'high' or 'highest' culpability." *Id.* at 2.

As this Court well knows, the eventual 2015 amendments to the fraud guidelines fell far short of the changes called for by the ABA Report; nevertheless, at least one sentencing court has endorsed their value post-amendments. *See United States v. Faibish*, No. 12-CR-265 ENV, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) ("[c]onsidering these alternate models, and applying common sense, the Court finds that a strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon [Defendant's] sentencing range beyond any reasonable proportion to his crimes.").

It is worth noting that Dr. Potarazu falls squarely within the perimeters of the type of defendant for whom the Task Force sought justice in sentencing. His guidelines sentencing range falls dramatically under the ABA proposal. Consider the following:[17]

| | |
|---|---|
| Base Offense | 6 |
| Loss | add 10 (Loss more than $5,000,000) |
| Culpability | subtract 3-5 (low culpability – little gain to defendant) |
| Victim Impact | add 6 (high – number of victims) |
| Role in the Offense | add 4 (leadership role adjustment) |
| | **Total =** 21-23. |

---

[17] This hypothetical scoring requires a number of assumptions to be sure; however, we have followed closely the analysis provided in "Case Scenario 2" which shares many material elements with the instant case. *Id.* at 13.

The alternate scoring produces a range of 37 to 57 months, literally half the sentence Dr. Potarazu faces now under the his calculated offense total of 29.

## IV.    APPLICATION OF THE 18 U.S.C. § 3553 FACTORS COMPEL A VARIANT SENTENCE

While the Court must consider the Guidelines calculation as part of the sentencing process, the Guidelines merely "serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).   After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), sentencing is guided by the seven sentencing factors that Congress  specified in 18 U.S.C. § 3553(a). Those factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(b) to afford adequate deterrence to criminal conduct;

(c) to protect the public from further crimes of the defendant; and

(d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

Rather than simply impose a sentence within the Guidelines range, the Court must consider the whole range of factors listed in 18 U.S.C. § 3553 and determine the sentence that is "'sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S at 101 (quoting 18 U.S.C. § 3553). Indeed, the Court may not even "presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). The sentencing court has wide latitude to impose a sentence below the Guidelines range, "perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007) (internal citations omitted). Here, the § 3553(a) factors overwhelmingly support a sentence that is far below the suggested Guidelines range.

### A. Dr. Potarazu's history and characteristics support a below-Guidelines sentence

In determining an appropriate sentence, the court must consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). But for the conduct that brings him before this Court, Dr. Potarazu has led an admirable life, full of hard work and personal achievement. His commitment to and support of his family, friends, and the Indian-American community in the Washington, D.C. area are well-demonstrated and commendable. Given the opportunity, he will remain an important presence to his wife, children, and extended community.

Sreedhar's supporters, who submitted letters to the Court, have shown him to be a good and decent person who deserves another chance despite the deep error of his response to difficult situation.[18] Collectively, the letter-writers demonstrate a continuing faith and trust in this man,

---

[18] The letters are hereto attached as an Appendix.

despite his actions and the criminal liability attributed to them.  Sreedhar respectfully asks for a sentence that will allow him the opportunity to be reunited with his family – especially his two daughters – while they can still benefit from his presence and guidance.

> **B.     The nature and circumstances of the offense support a below-Guidelines sentence**

As discussed *supra,* the evidence is clear – Dr. Potarazu did not create a Ponzi scheme, as he did not steal millions of dollars.  He developed a brilliant idea as an MBA student putting his medical expertise to work.  He built a real business – VitalSpring – that used analytics to help employers and payers to understand how to best spend their money in the healthcare space.  Real engineers developed real technology to process large volumes of data.  Real sales people sold real contracts to customers like McDonald's, Discovery Corporation, and Pactiv.  *See* Exhibit 1; Exhibit 2; Exhibit 3; Exhibit 4.  VitalSpring employees received real salaries; they sat in an office with real rent; the business operated with real costs for 16 years.  It is also important to note that Dr. Potarazu, unlike most defendants in fraudulent investment cases, did not see large gains.  He is not a typical fraud defendant who profits personally at the detriment of his investors  Instead, just as any person who attempts to establish a business and fails, Dr. Potarazu personally lost when VitalSpring did not succeed.

We have carefully reviewed the 70 letters submitted to the Court by investors and attached to the PSR.  We note for the Court's attention certain themes from the letters that are not accurate.  VitalSpring was not a Ponzi scheme and Dr. Potarazu does not have millions of dollars hidden in overseas bank accounts.  In fact, the uncontradicted evidence is that VitalSpring is a legitimate company that spent nearly $50 million on employee salaries from 2007 to 2016, which represents approximately 83 percent of all invested funds.

Dr. Potarazu admits his illegal conduct and accepts responsibility for his actions; however, he did not engage in this conduct with the intention of harming anyone.  He truly believed he could create a win/win situation for all involved – especially his investors – if only he could buy more time.

### C.      A below guidelines sentence will avoid unwarranted sentencing disparities

18 U.S.C. § 3553(a)(6) guides the Court to impose a sentence that "avoid[s] unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." The facts of every white collar case are different, of course, and the sentence appropriate in one may not be fitting of another.  However, some sense of consistency should be sought.  *See United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007) ("Even fulfilling their primary purpose with an eye toward the particular circumstances before them, judges must be mindful of the general goal, however elusive, of national consistency.").

The recent case involving Andrew Caspersen proves instructive in this regard.  *See* DOJ Press Release, *Former Finance Executive Andrew Caspersen Sentenced To Four Years In Prison For Defrauding Investors Of Over $38 Million And Misappropriating Over $8 Million From His Former Employer*,      https://www.justice.gov/usao-sdny/pr/former-finance-executive-andrew-caspersen-sentenced-four-years-prison-defrauding (Nov. 4, 2016).   Caspersen admitted to defrauding investors of over $38 million and misappropriating over $8 million for his own personal use.  His scheme was a classic Ponzi scheme – not a single investment dollar he induced was used for its stated purpose.  Even taking these factors into account, the district court saw fit to impose only a four year sentence for one count of securities fraud and one count of wire fraud.  *Id.* Caspersen's guidelines range was 151 to 188 months.  *See* Sentencing Submission by Defendant, *United States v. Caspersen,* No. 1:16-cr-00414 (S.D.N.Y. Nov. 16,2016), ECF No. 29.  There, as

here in Dr. Potarazu's case, the sentencing court has wide latitude to impose a sentence below the Guidelines range, "perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. at 351 (internal citations omitted).

### D.      Dr. Potarazu's cooperation with the Government warrants a downward departure

A defendant's willingness to cooperate offers a recent example and indicator of a defendant's character and willingness to recognize his or her criminal actions. *See United States v. Fernandez*, 443 F.3d 19, 24-25 (2d Cir. 2006) ("in terms of sentencing, [the court] think[s] cooperation is important because of what light it might shed on the character of a defendant, whether it shows the defendant has recognized the full implications of the choices they made in the past; whether they have decided to make a clean and full break with that and change their life in a significant way").   Under the § 3553 factors, the court can consider all relevant factors, including a defendant's cooperation outside the context of a § 5K1.1 motion. *See United States v. Doe*, 398 F.3d 1254, 1260 (10th Cir. 2005) ("defendant's assistance to the government is also relevant to the factors delineated in § 3553(a)(2), particularly the need for the sentence to promote respect for the law and to provide just punishment, to afford adequate deterrence, and to protect the public.").

This Court should consider Dr. Potarazu's extensive and ongoing cooperation with the government.   Since his arrest in October 2016, he has provided substantial assistance in the investigation of two potential defendants who have committed federal offenses.   As part of his cooperation, Dr. Potarazu has met with government investigators on two occasions and submitted

numerous documents and other written materials, including sworn declarations from two victims. The evidence against these two potential defendants is overwhelming. Crediting Dr. Potarazu now for his assistance in accumulating this evidence promoting respect for the law and affords protection to the public from additional illegal conduct.

### E. A below guidelines sentence will still afford adequate deterrence and protect the public

The public does not require any further protection from Dr. Potarazu nor is there reason to believe he will reoffend. Dr. Potarazu never intended to spend his life recruiting investors – he had one brilliant business idea that he attempted to bring to fruition. VitalSpring, now Yona, will operate without him. There is no next venture he looks to set up. These proceedings have been well publicized and there is no rational expectation that a potential investor would take a risk on Dr. Potarazu. Instead, he hopes to be reunited as soon as possible with his family and to turn his immense intelligence and skills back to his first passion – healing the blind as a practicing ophthalmologist.

Although general deterrence remains a required consideration under § 3553(a), there is little evidence to support a finding that a harsh sentence here is needed for such a purpose. The unique combination of motivation and circumstance that lead otherwise law abiding citizens to risk imprisonment are not so easily overcome by the simple imposition of lengthy sentences. While such a theory might be appealing on its face, the reality is that that there is little to no difference in the deterrent effect between probation and imprisonment. *See* Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 PRISON J. 48S, 50S-51S (2011) (according to "the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions"); *see also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("increases in severity of punishments do not yield significant (if any)

27

marginal deterrent effects.").   Moreover, this entire proceeding will serve as an appropriate deterrent for those who would consider in engaging conduct similar to that of Dr. Potarazu.  Dr. Potarazu stands before the Court as a man whose life, as he has known it until now, is ended.  He has lost his place of respect within his community; he is financially ruined; he has lost his reputation; and he has been incarcerated.  A lengthy jail sentence will do nothing beyond the indignities he has already suffered to discourage others from following in his path.

F.   **An alternative sentence of rigorous community service is sufficient, but not greater than necessary, to fulfill the statutory goals**

18 U.S.C. § 3553(a)(3) instructs the sentencing court to consider "the kinds of sentences available."  In certain cases, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S. 38, 54 (2007).  An alternative sentence of rigorous community service would accomplish the goals of "reflect[ing] the seriousness of the offense," "promot[ing] respect for the law," and "provid[ing] [a] just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  In the unique circumstances of this case, a multi-year sentence of rigorous, full-time community service is the option that best offers a just punishment while giving a community service organization the opportunity to make use of Dr. Potarazu's unique skill-set as an ophthalmologist.  A community service program would permit Dr. Potarazu to exercise his existing skills for the benefit of the community in a supervised, rigorous environment.  That would be far better for society than simply imprisoning him—especially where he has already suffered tremendously and there is no chance that he will commit crimes in the future.  There are a number of charitable organizations that could organize and supervise this type of intensive program for Dr. Potarazu in poverty-stricken areas within the United States.

## V.      CONCLUSION

Sreedhar Potarazu is a good and productive person who used terrible judgment when confronted with a failing business and the discontent of disappointed shareholders.  He is crushed by and regrets his actions; accepts responsibility for his conduct; has provided substantial assistance to the United States; and understands that there are serious consequences for his criminal conduct.  As the letter from his supporters and the facts and circumstances of this case clearly demonstrate, Sreedhar Potarazu is a good man who made terrible decisions for which he is forever ashamed.  For the foregoing reasons, we respectfully request that the Court impose a sentence far below the advisory guideline range.


Date: March 24, 2017                    Respectfully submitted,


                                        _____/s/ John L. Brownlee_____
                                        John L. Brownlee (VSB # 37358)
                                        John.brownlee@hklaw.com
                                        Stuart G. Nash (*pro hac vice*)
                                        Stuart.nash@hklaw.com
                                        Georgina C. Shepard (VSB #88654)
                                        Georgina.shepard@hklaw.com
                                        HOLLAND & KNIGHT LLP
                                        800 17th Street, NW, Suite 1100
                                        Washington, DC 20006

                                        *Counsel for Defendant Sreedhar Potarazu*

<u>CERTIFICATE OF SERVICE</u>

I, Georgina C. Shepard, am a member of the Bar of this Court. I hereby certify that on this 24th day of March, 2017, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, causing it to be served on all registered users.


Respectfully submitted,


_____/s/ Georgina C. Shepard_____
Georgina C. Shepard (VSB #88654)
georgina.shepard@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street, NW, Suite 1100
Washington, DC 20006
703-720-8660
703-720-8610 (Fax)

*Counsel for Defendant Sreedhar Potarazu*